**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. <u>R.</u> 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3197-18T1
     A-3271-18T1
     A-3526-18T1

PINE BROOK CARE CENTER,

  Plaintiff-Respondent/
  Cross-Appellant,

v.

MICHAEL D'ALESSANDRO,

  Defendant,

and

MARYANNE D'ALESSANDRO
and NANCY D'ALESSANDRO,

  Defendants-Appellants/
  Respondents,

and

ANTOINETTE SENFT,

  Defendant-Appellant/
  Cross-Respondent.

_____

Argued September 23, 2020 - Decided November 23, 2020

Before Judges Vernoia and Enright.

On appeal from the Superior Court of New Jersey, Law Division, Middlesex County, Docket No. L-4774-17.

Jon-Henry Barr argued the cause for appellant/cross-respondent Antoinette Senft (Barr & Gulyas, LLC, attorneys; Jon-Henry Barr, of counsel and on the briefs).

Howard R. Rabin argued the cause for appellants Maryanne D'Alessandro and Nancy D'Alessandro.

Kevin S. Englert argued the cause for respondent/cross-appellant Pine Brook Care Center (Law Office of Laurie M. Fierro, PA, attorneys; Laurie M. Fierro, of counsel; Kevin S. Englert, on the briefs).

PER CURIAM

This matter began as a collection case brought by plaintiff Pine Brook Care Center for sums due for nursing home services rendered to Michael D'Alessandro (Michael).[1]  Plaintiff asserted various causes of action against Michael's daughters, defendants Maryanne D'Alessandro (Maryanne), Nancy D'Alessandro (Nancy), and Antoinette Senft (Antoinette) (collectively

---

[1]  Because three of the parties share the same surname, D'Alessandro, we use first names for clarity and ease of reference.  We intend no disrespect in doing so.

defendants), claiming they are personally liable for sums due for Michael's nursing home care.[2]

The court granted defendants summary judgment on plaintiff's various causes of action, finding the Nursing Home Act (NHA), N.J.S.A. 30:13-1 to -17, and more particularly, N.J.S.A. 30:13-3.1(a)(2), "shields . . . defendants from liability as [the statute] prohibits third parties from incurring liability for bills of nursing home residents," but the court denied defendants' requests for attorney's fees. During the litigation, the court also denied plaintiff's motion for an extension of the discovery period, its motion for reconsideration of the denial, and its motion to strike Maryanne's answer for failing to provide discovery. The litigation ended in the trial court when the court granted plaintiff's summary judgment motion on Nancy's and Antoinette's counterclaims.

In A-3271-18, plaintiff appeals from orders granting defendants summary judgment, denying its request for an extension of discovery and for reconsideration of the denial, and denying its motion to strike Maryanne's answer. In A-3197-18, Antoinette appeals from the court's order granting

---

[2] Maryanne is variously referred to in the trial court record as "Maryanne," "Maryann," and "Mary Ann." We employ the first of these monikers because that is the name used to identify her in the caption of the complaint and, to our knowledge, there was no order entered changing that designation.

plaintiff's motion for summary judgment on her counterclaim and denying her request for an award of attorney's fees under N.J.S.A. 30:13-4.2 and -8. In A-3526-18, Maryanne and Nancy appeal from an order denying their motions for attorney's fees.[3] We consolidated A-3271-18 and A-3197-18, scheduled them back-to-back with A-3526-18, and address the issues presented in the appeals in this opinion.

Based on our review of the record and the arguments of the parties, we affirm in part, reverse in part, vacate in part, and remand for further proceedings.

I.

Resolution of many of the issues in this appeal is dependent on the validity of the court's orders granting defendants summary judgment on plaintiff's claims. In our review of the record before the court on defendants' summary judgment motions, we accept the facts and all reasonable inferences therefrom in the light most favorable to plaintiff because it is the party against whom summary judgment was entered. Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540 (1995). Applying that standard, we first detail the facts pertinent to defendants' motions for summary judgment.

---

[3] In A-3526-18, plaintiff cross-appealed from the same orders that are the subject of its appeal in A-3271-18.

4

Plaintiff "owns and operates a long-term skilled nursing [home] facility" that accepts Medicaid benefits in payment of its residents' fees and costs. In October 2016, Michael was admitted to the facility, and he remained a resident through the March 2019 entry of the trial court's final order.

More than two years prior to his admission, on April 24, 2014, the Chancery Division entered an order finding Michael "a vulnerable adult and an incapacitated person," and appointing Antoinette, Nancy, and Maryanne as his guardians. On November 14, 2014, the court entered an order at the guardians' request authorizing disbursement of the net proceeds from a $185,000 sale of real property and requiring deposit of the proceeds into a guardianship account for Michael's "benefit and welfare."

In October 2016, Tina Manganella was the nursing home's admission director. Prior to the October 7, 2016 admission of Michael into plaintiff's nursing home, Manganella informed Antoinette that Michael would be admitted as a private-pay-rate resident because "he was not eligible for Medicare [at the] time and . . . he was not already qualified for Medicaid." Antoinette informed Manganella "she was working with [a third-party service] to begin the Medicaid application process." Antoinette supplied Manganella with the telephone

number of a third-party service's representative "as proof the process [of applying for Medicaid] had begun."

On the day of Michael's admission to the nursing home, Antoinette and Nancy appeared at the facility "and were later joined by [Maryanne]." Manganella explained the admissions paperwork to Antoinette and Nancy, and Manganella was told the family would not use a third-party service to apply for Medicaid benefits for Michael, but instead "would file the application themselves." Manganella "cautioned the family that it was their responsibility to obtain Medicaid benefits" for Michael. She also inquired whether Michael had received, owned, or transferred any property during the preceding five years, and was told "no."

During the admission process, Nancy and Antoinette signed a series of agreements and documents presented by plaintiff. We briefly describe three of the agreements pertinent to the claims asserted in the complaint: the ADMISSION AGREEMENT, the AGREEMENT TO PAY, and the PAYOR AGREEMENT.[4] Included in the thirteen causes of action of the complaint are claims based in whole or in part on alleged breaches of these agreements.

---

[4] By identifying and describing these agreements, we do not suggest there were not many other documents presented during the admission process that are pertinent to the issues raised by the parties' pleadings.

A-3197-18T1

The ADMISSION AGREEMENT

The ADMISSION AGREEMENT, which Antoinette and Nancy signed as Michael's "Agent[s]" and Antoinette also signed as Michael's "Legal Representative," explains a nursing home may not require a third-party guarantee of payment for a nursing home's services. The agreement states: "FEDERAL AND STATE LAWS PROHIBIT A NURSING HOME FROM REQUIRING A THIRD[-]PARTY GUARANTEE OR PAYMENT TO THE FACILITY AS A CONDITION OF ADMISSION, EXPEDITED ADMISSION, OR CONTINUED STAY IN THE FACILITY."

The ADMISSION AGREEMENT also provides: "A resident is considered Private ("Private Pay") when no State or Federal program is paying for the resident's Room & Board."

The ADMISSION AGREEMENT further provides for the transition of a resident from private-pay status to payment of his or her costs by Medicaid, stating:

> When private funds are depleted the Resident or responsible party acting upon the [R]esident's behalf applies for Medicaid assistance. The application processing time can be lengthy. The Facility wants to ensure that, if the Resident runs out of private monies, he or she will be able to pay for the services provided by the Facility.

7

[Emphasis added.]

In addition, the ADMISSION AGREEMENT imposes an obligation to apply for Medicaid benefits where the nursing home resident requires coverage under the Medicaid Assistance Program:

> If the Resident elects coverage under the Medicaid Assistance Program, the Resident or responsible party agrees to apply for the program at the appropriate Medicaid office. These actions must include, but are not limited to, taking any and all steps necessary, to the extent permitted by law, to ensure that the Resident's assets are within the required limits and that these assets remain within allowable limits for Medicaid assistance.
>
> [Emphasis added.]

The ADMISSION AGREEMENT defines the rates a resident is obligated to pay following the expiration or retroactive termination of his or her Medicaid coverage: "If the Resident remains in the Facility after Medicaid coverage has expired or been retroactively terminated or denied, the Resident shall pay Facility charges as a Private[-]Pay resident such that the Resident shall pay based upon private rates, charges and terms in effect at the time of service." (Emphasis added.)

The AGREEMENT TO PAY

Antoinette and Nancy also signed an AGREEMENT TO PAY as Michael's "Designated Representative[s] and/or Sponsor[s]." Michael did not sign the agreement as the "Resident." In part, the agreement makes provisions for payment of a nursing home resident's charges by the "Designated Representative" and "Sponsor." The AGREEMENT TO PAY states:

> I acknowledge and agree that I, as the Resident, Designated Representative and/or Sponsor, am responsible for and will pay for all charges, at the private pay rate for the room and board and all the ancillary charges incurred from admission until discharge or until another source of coverage becomes eligible in accordance with federal and state laws and regulations, including any amount not paid by any insurance plan or any other third[-]party coverage.
>
> [Emphasis added.]

The PAYOR AGREEMENT

On Michael's admission date, Antoinette and Nancy also executed a PAYOR AGREEMENT. The agreement provides the following "Information Regarding a Personal Guarantee of Payment":

> The Facility does not require a third[-]party guarantee of payment to the facility as a condition of admission or expedited admission or continued stay in the facility.
>
> The Facility does require an individual who has legal access to a resident's income or resources available to

9                                                    A-3197-18T1

pay for facility care to sign a contract, without incurring personal liability, to provide facility payment from the resident's income or resources.

[Emphasis added.]

As indicated on the PAYOR AGREEMENT, Antoinette and Nancy "decline[d]" to voluntarily guarantee payment "for services provided to" Michael. However, they agreed, as plaintiff required, "to pay [Michael's] funds to [plaintiff] for goods and services provided to [him] under the Admission Agreement." The PAYOR AGREEMENT further states that by agreeing to make payment from Michael's funds, neither Antoinette nor Nancy "assum[e] personal liability for any payment except up to the amount of the income or assets belonging to [Michael] over which [either] had, have or will have authorized control."

The AUTHORIZATION TO APPLY/APPEAL FOR MEDICAID ELIGIBILITY

On October 7, 2016, Antoinette and Nancy also signed the AUTHORIZATION TO APPLY/APPEAL FOR MEDICAID ELIGIBILITY. The document authorizes plaintiff "to file [on Michael's behalf] an application for Long[-]Term Care Medicaid [benefits] with the Monmouth County Board of

Social Services," obtain Michael's "financial records and statements needed" to qualify for Medicaid benefits, and appeal from any denial of benefits.

Michael's Residency in Plaintiff's Nursing Home

On October 7, 2016, Michael was admitted to plaintiff's nursing home with a private-pay status. That is, payment for Michael's care was not covered by Medicaid or Medicare. Manganella later "reach[ed] out" to Antoinette, Nancy, and Maryanne to determine the status of the Medicaid application. Manganella suggested third-party services that assist in the Medicaid application process, but she was told "the application would be handled by [an] attorney." However, that did not occur. Manganella also offered Antoinette "assistance in completing the application," but the offer was declined.

At the time of Michael's admission to the nursing home, Antoinette, Nancy, and Maryanne served as his guardians pursuant to the Chancery Division order. On May 10, 2017, however, the court "discharged" Antoinette and Nancy as Michael's guardians "for health reasons." Maryanne thereafter served as Michael's sole guardian.

In October 2017, one year after Michael's admission to the nursing home, Maryanne first applied for Medicaid benefits on his behalf. It was "determined . . . Michael was clinically eligible for Medicaid benefits for skilled

nursing home care," but the Monmouth County Board of Social Services (MCBOSS) requested additional documentation to establish his financial eligibility. MCBOSS established a deadline for submission of the requested information and extended the deadline at Maryanne's request, but it denied the application because the information was not supplied. MCBOSS later agreed to re-evaluate the application if Maryanne supplied the requested information, but the information was never supplied, and there is no evidence any further efforts were made by Maryanne, Antoinette, or Nancy to obtain Medicaid benefits on Michael's behalf.

Michael obtained approval for Medicaid benefits effective September 21, 2018, almost two years after he was first admitted to plaintiff's facility.[5]

The Complaint, Answers and Counterclaims, and Motion Practice

In August 2017, plaintiff filed a complaint, which was subsequently amended on two occasions. We summarize the allegations in the second amended complaint because it was the operative complaint when the court entered the orders challenged on appeal.

---

[5] The record does not reveal the process through which Michael finally obtained Medicaid benefits.

A-3197-18T1

In count one, the complaint asserts a claim against Michael for the sums due.[6] The remaining counts of the complaint are variously asserted against Antoinette, Nancy, and Maryanne.

Count two alleges plaintiff detrimentally relied on Antoinette's and Nancy's representations they would apply for Medicaid benefits, and they failed to apply for the benefits. Count three alleges Antoinette and Nancy violated the PAYOR AGREEMENT by failing to use Michael's assets over which they had control to pay for the nursing home services, and count four alleges they violated the AGREEMENT TO PAY by failing to pay for the services provided to Michael. Count five alleges they violated the ADMISSION AGREEMENT by failing to apply for Medicaid benefits.

Count six alleges Maryanne voluntarily assumed the duty to apply for Medicaid benefits and negligently breached that duty. Count seven alleges Antoinette, Nancy, and Maryanne interfered with plaintiff's prospective economic advantage by failing to apply for Medicaid benefits, and count eight asserts they wrongfully executed control over Michael's assets. In count nine,

---

[6] The disposition of plaintiff's cause of action against Michael is not an issue on appeal.

13

it is alleged defendants were unjustly enriched by failing to turn over to plaintiff Michael's available assets for payment for the nursing home's services.

Count ten avers Antoinette and Nancy "interfered with Michael['s] . . . contractual relationship with [plaintiff]." Count eleven alleges Antoinette, Nancy, and Maryanne breached their fiduciary duty as guardians to apply for Medicaid benefits for Michael's nursing home care. Count twelve alleges defendants breached their duties as Michael's daughters to pay for his care and count thirteen alleges they are liable for the costs of Michael's care under N.J.S.A. 44:1-140.

Plaintiff received a $9,600 check signed by Antoinette at the time of Michael's admission, and thereafter plaintiff received only his social security income in payment for its services. Plaintiff's accounts receivable supervisor, Rosemarie Barruos, certified plaintiff provided $212,992.03 in services to Michael, plaintiff received only $31,699 on his behalf, and plaintiff was owed $181,293.03 for the outstanding balance.

Antoinette initially filed a pro se answer to the complaint generally denying the allegations. Nancy filed an answer and a crossclaim against Maryanne, alleging she breached her duties as guardian by failing to obtain Medicaid benefits for Michael. Nancy also filed a counterclaim alleging

14

plaintiff's attempt to impose liability upon her "constitute[d] an unfair, deceptive and/or fraudulent trade and/or commercial practice" (count one); plaintiff violated "the Nursing Home Reform Act of 1987, . . . 42 U.S.C. §§ 1395i(3)(c)(5)(A)(ii) [and] 1396r(c)(5)(A)(ii)" (count two); plaintiff violated the New Jersey Consumer Fraud Act (CFA), N.J.S.A. 56:8-1 to -20, (count three); and plaintiff engaged in misrepresentation (count four). The counterclaim further alleges plaintiff's actions were willful and wanton (count five), and the contracts upon which plaintiff's claims were based are unenforceable (count six).

After she obtained counsel, Antoinette filed an amended answer to the complaint, and a counterclaim and crossclaim identical to those asserted on Nancy's behalf. Maryanne also filed an answer, but it did not include a counterclaim or crossclaim.

In April 2018, Nancy filed an amended answer, counterclaim, and crossclaim. The counterclaim added causes of action alleging plaintiff failed to mitigate its damages by failing to apply for Medicaid benefits on Michael's behalf (count seven), and plaintiff was contributorily negligent (count eight). The amended crossclaim added a claim that Antoinette breached her duty as the "point person" for Michael's financial affairs.

On April 27, 2018, the court suppressed Antoinette's and Maryanne's answers without prejudice for failing to provide discovery. Antoinette's answer was reinstated on June 22, 2018.

Maryanne later filed a motion to reinstate her answer. Plaintiff opposed the motion and cross-moved to dismiss the answer with prejudice. Maryanne supplied some of the delinquent discovery. Plaintiff withdrew its motion to suppress Maryanne's answer, but it opposed her motion to reinstate the answer unless she supplied fully responsive discovery responses. On August 3, 2018, the court entered an "ORDER GRANTING MOTION TO VACATE DISMISSAL" of Maryanne's answer, which allowed reinstatement of Maryanne's answer if she supplied outstanding discovery within thirty days.

On August 7, 2018, plaintiff filed its second amended complaint, and, on the same day, Antoinette filed an answer and counterclaim and moved for summary judgment on plaintiff's claims. The following day, plaintiff requested that Antoinette file more specific answers to interrogatories. A week later, Nancy filed an answer, counterclaim, and crossclaim, as well as a summary judgment motion nearly identical to Antoinette's.

On August 29, 2018, plaintiff filed a motion to extend discovery. Plaintiff asserted the extension was required because plaintiff was awaiting complete

discovery responses from Antoinette and it had a pending motion to compel discovery from Nancy. Plaintiff also noted the second amended complaint had only been filed on August 7, 2018. Plaintiff further indicated Antoinette's and Nancy's summary judgment motions were pending, with Antoinette's summary judgment motion scheduled for oral argument on September 14, 2018, and oral argument on Nancy's summary judgment motion not yet scheduled.

In September, Maryanne filed a summary judgment motion that was essentially identical to her sisters' pending motions. On September 14, 2018, the court denied plaintiff's motion to extend discovery and, a few days later, scheduled the matter for trial on December 3, 2018.

Plaintiff subsequently moved for reconsideration of the court's order denying the requested discovery extension, and later filed a motion to strike Maryanne's answer for failure to comply with the August 3, 2018 order conditioning reinstatement of her answer on her supplying outstanding discovery. The trial date was subsequently adjourned to January 22, 2019.

On December 5, 2018, the court heard oral argument on the following motions: Antoinette's, Nancy's, and Maryanne's motions for summary judgment and for attorney's fees; plaintiff's motion to strike Maryanne's answer; plaintiff's

motion for reconsideration of the court's order denying the motion for a discovery extension; and plaintiff's motion to file a third amended complaint.

After hearing oral argument, the court granted defendants' summary judgment motions. The court determined plaintiff's causes of action were barred by N.J.S.A. 30:13-3.1(a)(2) because the statute precluded the imposition of personal liability against Antoinette, Nancy, and Maryanne for nursing home services provided to Michael. The court found the statute "prohibits plaintiff from seeking payment for outstanding bills directly from . . . defendant[s'] assets."

The court further found Antoinette's and Nancy's exercise of the option in the PAYOR AGREEMENT to not guarantee payment for plaintiff's services was not "preempted" by any provision in the ADMISSION AGREEMENT suggesting they had personal liability for sums due for plaintiff's services to Michael. The court denied defendants' requests for attorney's fees, finding the award was discretionary under Rule 1:10-3 and the requested award was not "appropriate."

The court denied plaintiff's motion to strike Maryanne's answer. The court concluded the motion was moot because it granted Maryanne's summary judgment motion.

The court further denied plaintiff's motion for reconsideration of its order denying the requested discovery extension. The court found plaintiff failed to demonstrate the denial of the initial motion was palpably incorrect or founded on an irrational basis, or that the court failed to consider probative evidence. The court also denied plaintiff's motion to file a third amended complaint. As a result of the court's disposition of the motions, the only claims remaining were Antoinette's and Nancy's counterclaims against plaintiff.[7]

Plaintiff moved for summary judgment on the outstanding counterclaims. On March 13, 2019, the court granted plaintiff's motion and entered an order awarding plaintiff summary judgment on the counterclaims.

The Appeals

As noted, plaintiff appeals from the December 5, 2018 orders granting defendants summary judgment, denying its request for an extension of discovery and for reconsideration of the denial, and denying its motion to suppress Maryanne's answer. Antoinette appeals from the March 13, 2019 order granting plaintiff's motion for summary judgment on her counterclaim and the December

---

[7] The record does not include an answer with a crossclaim filed on Maryanne's behalf in response to the second amended complaint. Maryanne filed a motion for summary judgment in response to the complaint and, therefore, did not have a pending counterclaim after her summary judgment motion was granted.

5, 2018 order denying her request for an award of attorney's fees under N.J.S.A. 30:13-4.2 and -8. Maryanne and Nancy appeal from the December 5, 2018 order denying their motion for attorney's fees.[8]

## II.

We first consider plaintiff's appeal from the court's orders granting defendants summary judgment. We review an order granting summary judgment de novo, applying the same standard as the trial court. Globe Motor Co. v. Igdalev, 225 N.J. 469, 479 (2016). We are required to determine whether, viewing the facts in the light most favorable to the non-moving party, the movant has demonstrated there are no genuine disputes as to any material facts and the movant is entitled to judgment as a matter of law. R. 4:46-2(c); Brill, 142 N.J. at 540. "A trial court's interpretation of the law and the legal consequences that flow from established facts are not entitled to any special deference." Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995).

Plaintiff argues the order granting defendants summary judgment must be reversed because the court erred by finding "the plain language of N.J.S.A. 30:13-3.1(a)(2) shields . . . defendants from [personal] liability [and] prohibits

---

[8] In A-3526-18, plaintiff cross-appealed from the same orders that are the subject of its appeal in A-3271-18.

third parties from incurring liability for bills of nursing home residents." Plaintiff claims the statute prohibits a nursing home only from "requiring a third[-]party guarantee of payment." Plaintiff further argues its claims against defendants are not barred by N.J.S.A. 30:13-3.1(a)(2) because they are founded on tortious conduct and breaches of contractual obligations that are either not guarantees of payment or were not required.

When interpreting a statute, we are required to determine "the intent of the Legislature." Hardy ex rel. Dowdell v. Abdul-Matin, 198 N.J. 95, 101 (2009). A court must first consider the statute's plain language because that is the "best indicator of [legislative] intent," DiProspero v. Penn, 183 N.J. 477, 492 (2005), and we must "ascribe to the statutory words their ordinary meaning and significance, and read them in context with related provisions so as to give sense to the legislation as a whole," Hardy, 198 N.J. at 101 (citing DiProspero, 183 N.J. at 492); see also Wilson ex rel. Manzano v. City of Jersey City, 209 N.J. 558, 572 (2012).

A court "will not presume that the Legislature intended a result different from what is indicated by the plain language or add a qualification to a statute that the Legislature chose to omit." Tumpson v. Farina, 218 N.J. 450, 467-68 (2014). If the words of a statute are clear, a court should not infer a meaning

A-3197-18T1

other than what is plainly written, see Hardy, 198 N.J. at 101, and "the inquiry is over," In re T.B., 236 N.J. 262, 274 (2019) (quoting State v. Harper, 229 N.J. 228, 237 (2017)). It is only where "the plain language is ambiguous [that] we consider extrinsic interpretative aids, including legislative history." State v. S.B., 230 N.J. 62, 68 (2017).

"[T]he NHA serves to complement the federal Nursing Home Reform Act, 42 U.S.C.A. § 1396r, Congress's statutory scheme intended to protect nursing home residents and their families." Manahawkin Convalescent v. O'Neill, 217 N.J. 99, 116 (2014). Under federal law, "a nursing facility must . . . not require a third party guarantee of payment to the facility as a condition of admission (or expedited admission) to, or continued stay in, the facility . . . ." 42 U.S.C. § 1396r(c)(5)(A)(ii). That federal statute, however, does not "prevent[] a facility from requiring an individual, who has legal access to a resident's income or resources available to pay for care in the facility, to sign a contract (without incurring personal financial liability) to provide payment from the resident's income or resources for such care." Id. § 1396r(c)(5)(B)(ii). As explained by the Court in Manahawkin Convalescent, "federal law has long barred nursing homes accepting either Medicaid or Medicare from compelling third party guarantees of resident payment, but permits such facilities to require individuals

with legal access to the resident's assets to pay for the resident's care with such assets." 217 N.J. at 116.

In 1997, our State "Legislature amended the NHA to add language similar to" the federal statutory provisions. Id. at 117; see also L. 1997, c. 241, § 3. The amendment, which is codified in N.J.S.A. 30:13-3.1(a)(2), provides in pertinent part as follows:

> A nursing home shall not, with respect to an applicant for admission or a resident of the facility:
>  . . . .
>
> (2) require a third[-]party guarantee of payment to the facility as a condition of admission or expedited admission to, or continued residence in, that facility; except that when an individual has legal access to a resident's income or resources available to pay for facility care pursuant to a durable power of attorney, order of guardianship or other valid document, the facility may require the individual to sign a contract to provide payment to the facility from the resident's income or resources without incurring personal financial liability.
>
> [N.J.S.A. 30:13-3.1(a)(2).]

"This provision applies only 'to those distinct parts of a nursing home certified to participate in the Medicare or Medicaid program.'" Manahawkin Convalescent, 217 N.J. at 117 (quoting N.J.S.A. 30:13-3.1(c)). Plaintiff is a

23

nursing home certified to participate in the Medicaid program, and it is subject to the statute's requirements.

In granting summary judgment to defendants, the court did not separately analyze plaintiff's numerous causes of action. Instead, the court determined N.J.S.A. 30:13-3.1(a)(2) broadly prohibits third-party personal liability for monies owed to a nursing home for a resident's care. The court concluded "Manahawkin [Convalescent] prohibits plaintiff from seeking payment for outstanding bills directly from [a third party's] assets."

We disagree with the motion court's reliance on Manahawkin Convalescent because in that case the Court considered a limited and different issue than the one presented by defendants' summary judgment motions. In Manahawkin Convalescent, a nursing home brought a breach of contract action against the daughter of a nursing home resident seeking sums due for her mother's care. Id. at 105. At the time of her mother's admission, the defendant signed an agreement providing that she, as the "Responsible Party," and her mother "shall pay" the plaintiff's bills for caring for the resident. Id. at 108. The plaintiff had also provided the defendant with a form stating the plaintiff "could not require [the defendant] to guarantee payment from her own assets as a condition of her mother's admission to the facility." Id. at 106.

24

The defendant filed a counterclaim alleging the nursing home violated the NHA, the CFA, and the Truth-in-Consumer Contract, Warranty, and Notice Act, N.J.S.A. 56:12-14 to -18, by seeking to collect monies from her personal assets based on a contract that violated the NHA. Id. at 105-06. The Court determined the plaintiff did not violate the NHA because: the contract did not require the defendant to "commit[] . . . her personal assets to pay for the resident's care"; the form provided to the defendant limited her obligation to pay for the services only from her mother's assets; and the plaintiff, which had withdrawn its claim for the sums due, indicated its collection efforts were limited only to the resident's assets over which the defendant exercised control. Id. at 119. The Court concluded the plaintiff sought relief based on a contract that was expressly permitted by N.J.S.A. 30:13-3.1(a)(2) because the statute authorizes a nursing home to "require" a third party to agree to provide payment from the resident's "personal funds" without incurring personal liability. Id. at 120.

In Manahawkin Convalescent, the Court was required to determine only whether a contract obligating a third party to make payments for a resident's care from the resident's assets violated N.J.S.A. 30:13-3.1(a)(2). The Court was not presented with, and did not decide, the broader issue presented here: whether N.J.S.A. 30:13-3.1(a)(2) prohibits the imposition of personal liability on a third

25

party based on contractual obligations that are not guarantees of payment and based on other tort-based theories of liability. To resolve that issue, we turn, as we must, to the statute's plain language. DiProspero, 183 N.J. at 492.

N.J.S.A. 30:13-3.1(a)(2) is comprised of two parts. In the first, the Legislature defined the type of agreement a nursing home is prohibited from requiring as a condition of a resident's admission or continued residence in a nursing home. The statute bars a nursing home from "requir[ing] a third party guarantee of payment to the facility as a condition of [a resident's] admission or expedited admission to, or continued residence in, that facility." N.J.S.A. 30:13-3.1(a)(2). "A guarantee is a collateral engagement to answer for the debt, default or miscarriage of another person." Black's Law Dictionary 849 (11th ed. 2019) (quoting Henry Anselm de Colyar, A Treatise on the Law of Guarantees and of Principal & Surety 1 (3d ed. 1897)); see, e.g., Regions Bank v. Legal Outsource PA, 936 F.3d 1184, 1191 (11th Cir. 2019) (A "guaranty" is "a promise by a guarantor to answer for the payment of some debt if the person liable in the first instance is unable to pay.").

The plain language of the statute is in accord with the ordinary definition of guarantee; it prohibits requiring a "guarantee of payment." N.J.S.A. 30:13-3.1(a)(2). Thus, the plain language of the first section of N.J.S.A. 30:13-

3.1(a)(2) bars a nursing home from requiring that a third party guarantee the resident's payment for a nursing home's services as a condition of the resident's admission or continued residence.

Application of the statute is not, however, limited to formal "guarantees of payment" or agreements designated as such. In Manahawkin Convalescent, the Court considered a third party's contractual obligation to pay the costs of a nursing home resident's care as an agreement within the coverage of N.J.S.A. 30:13-3.1(a)(2), and explained the agreement was unenforceable unless the third party's liability was limited to "payment of [the resident's] bills using [the resident's] assets." 217 N.J. at 118-19. It would have been unnecessary for the Court to conduct the analysis of the agreement's enforceability under the second part of the statute unless it determined the third party's agreement to pay constituted a "guarantee of payment" under the statute's first part. See, e.g., Manor of Lake City, Inc. v. Hinners, 548 N.W.2d 573, 575-76 (Iowa 1996) (finding an "agreement-to-pay provision" in a nursing home admission agreement violates the Nursing Home Reform Act if it requires a third party to assume personal financial liability as a condition of a resident's admission); Podolsky v. First Healthcare Corp., 58 Cal. Rptr. 2d 89, 97 (Cal. App. Div. Super. Ct. 1996) (noting the purpose of the Nursing Home Reform Act was to

27

prohibit nursing homes from requiring a third party to "assume personal responsibility for any cost of the resident's care" regardless of whether the person was a "responsible party" or a "third party guarantor"). Thus, the first part of N.J.S.A. 30:13-3.1(a)(2) prohibits a nursing home from requiring a third-party guarantee of payment—including direct agreements to pay—as a condition of a resident's admission or continued residence in a facility. The statute prohibits nothing else.

The statute's first part does not prohibit a nursing home from requiring any other third-party obligations as a condition of a resident's admission or continued residence. We may assume because the Legislature chose to specifically identify the proscribed condition—required guarantees of payment—it did not intend to prohibit a nursing home from requiring that a third party agree to other obligations as conditions of a resident's admission to, or continued residence in, a facility. See DiProspero, 183 N.J. at 493 (explaining a court is "enjoined from presuming that the Legislature intended a result different from the wording of the statute"). We may not "add[] a qualification" to a statute that the Legislature has "omitted." Ibid.

The second part of the statute does not expand the nature or scope of the limitations imposed in the first. The second part merely provides a limited and

defined exception to the prohibition against requiring guarantees of payment. Specifically, it allows a nursing home to require individuals, such as Antoinette and Nancy here, who have "legal access to a resident's income or resources available to pay for facility care pursuant to . . . [an] order of guardianship . . . to sign a contract to provide payment to the facility from the resident's income or resources without incurring personal financial liability."[9]   N.J.S.A. 30:13-3.1(a)(2).  That is, the statute's second part allows a nursing home to require a third-party agreement to pay for a resident's care that, absent an exception, would constitute a prohibited "guarantee of payment."  It permits an agreement to pay only from the resident's income and assets without the third party incurring any personal financial liability.  See Manahawkin Convalescent, 217 N.J. at 119-20  (finding a third party's agreement to pay for the resident's care did not violate N.J.S.A. 30:13-3.1(a)(2) because the agreement required the third party to pay only from the resident's income and resources).

Defendants read the exception in the second part of N.J.S.A. 30:13-3.1(a)(2), and especially the phrase "without incurring personal financial liability," as requiring the conclusion that a third party can never have personal liability for the resident's costs, even if the third party violates a duty unrelated

---

[9]  Maryanne did not sign any of the agreements at issue.

to an agreement to pay for the resident's care. That interpretation ignores the statute's plain language and the context of the phrase in the statute.

Moreover, we are confident that if the Legislature intended to grant the broad immunity from personal liability the court found, and which defendants urge, it would have done so more clearly and directly. Instead, the plain and unambiguous language of the exception in N.J.S.A. 30:13-3.1(a)(2) simply means an individual may be required to agree "to provide payment to the facility from the resident's income or resources," but, by doing so, the individual does not become personally liable—or guarantee payment of—the sums due for the resident's care.

In sum, the statute provides only that a nursing home may not require a third-party guarantee of payment as a condition of a nursing home resident's admission or continued residence. A nursing home, however, may require that an individual who has control over a resident's income and assets agree to pay for the resident's care from that income and those assets without incurring any personal financial liability. The statute does not prohibit a nursing home from requiring that an individual enter into an agreement other than a guarantee of payment, and the statute does not immunize individuals from personal liability

based on contractual obligations undertaken that are not proscribed by N.J.S.A. 30:13-3.1(a)(2), or that are founded on alleged tortious conduct.

Defendants assert there are good policy reasons to provide broad protection from personal liability for third parties who have responsibility for individuals in need of nursing home care. However, the Legislature has determined, at least in N.J.S.A. 30:13-3.1(a)(2), that the protection of third parties is limited to the prohibition against requiring guarantees of payment, with a single exception allowing a requirement that the third party pay the sums due for care from the resident's income and assets without incurring personal liability. We cannot extend the protections of the statute beyond that which the Legislature deemed appropriate to provide, see DiProspero, 183 N.J. at 492, and we must apply the statute's plain language, see Hardy, 198 N.J. at 101.

The court granted defendants' motions for summary judgment based on its determination that N.J.S.A. 30:13-3.1(a)(2) bars imposition of any personal financial liability against third parties for costs of a nursing home resident's care. For the reasons we have explained, that is not the case. We therefore reverse the court's orders granting summary judgment on plaintiff's claims against defendants.

31

By reversing the summary judgment awards, we do not preclude defendants from arguing or asserting as a defense that one or more of plaintiff's claims should fail as a matter of law because they are founded on an agreement or agreements that are unenforceable under N.J.S.A. 30:13-3.1(a)(2). Defendants are free to make such arguments and assert all available defenses to plaintiff's asserted claims as this matter continues in the trial court.

Plaintiff's claims are founded on a myriad of documents that comprise what appears to be a complex and, in some respects, seemingly inconsistent set of terms and conditions. For example, and not by way of limitation, the AGREEMENT TO PAY includes a provision in which Antoinette and Nancy agree to pay for Michael's care, but, in the PAYOR AGREEMENT, they exercise an option, presented by plaintiff, not to accept any personal financial liability for costs of Michael's care. We do not offer an opinion on this apparent conflict or on any other issues concerning the terms of any alleged agreement between the parties. We note it only as an example of the many terms and conditions presented at the time of Michael's admission and upon which plaintiff's various claims are based.

The court resolved the conflict between the two agreements in conclusory fashion, finding the PAYOR AGREEMENT was not "preempted" by the

AGREEMENT TO PAY. The court's conclusion is untethered to any findings of fact, and the court otherwise did not make any findings defining the terms of the parties' agreement and the circumstances under which it was made.

It is not possible to determine the enforceability of an agreement under N.J.S.A. 30:13-3.1(a)(2) unless the agreement's terms and conditions and the circumstances under which the agreement was made are determined. Where, as here, there are numerous documents with conflicting provisions that allegedly comprise the agreement upon which a plaintiff's causes of action are based, findings of fact as to the terms of the agreement must first be made. We will not make such findings for the first time on appeal, see Est. of Doerfler v. Fed. Ins. Co., 454 N.J. Super. 298, 302 (App. Div. 2018), and we do not offer an opinion as to whether the summary judgment record presents undisputed material facts permitting a determination of the precise terms of any purported agreement upon which plaintiff relies in support of its claims.

We observe, however, that an agreement to make an application for Medicaid benefits on Michael's behalf is not a guarantee of payment or an agreement to pay proscribed by N.J.S.A. 30:13-3.1(a)(2). By making any purported agreement to apply for Medicaid payments, neither Antoinette, Nancy, nor Maryanne guaranteed payment for the costs of Michael's nursing

home care or agreed to pay those costs. Thus, any such agreement, if proven, does not run afoul of N.J.S.A. 30:13-3.1(a)(2) and is not unenforceable under its terms. An agreement to apply for Medicaid benefits is just that—a commitment to assist the resident in obtaining Medicaid benefits so those benefits pay for his or her care. A failure to honor that commitment does not convert an agreement to apply for Medicaid benefits into a guarantee of payment or an agreement to pay the resident's costs of care under N.J.S.A. 30:13-3.1(a)(2). See, e.g., Meadowbrook Ctr., Inc. v. Buchman, 90 A.3d 219, 234, 241 (Conn. App. Ct. 2014) (finding an agreement requiring a third party to apply for Medicaid benefits for a nursing home resident does not fall within 42 U.S.C. § 1396r(c)(5)(A)'s proscription against requiring "a third[-]party guarantee of payment . . . as a condition of admission . . . to, or continued stay in, the facility"). To otherwise interpret N.J.S.A. 30:13-3.1(a)(2) would impermissibly expand the statute's coverage well beyond the limited proscriptions established by its plain and unambiguous language.

We offer no opinion on the merits of any of plaintiff's claims or the defenses to them. We reverse the court's summary judgment award to defendants without prejudice and remand for further proceedings. Any and all claims and defenses shall be addressed by the trial court on remand in

34

accordance with its management of the case and based upon the record presented.

## III.

Plaintiff next contends the court erred by denying its motions to suppress Maryanne's answer. Plaintiff also argues Maryanne's answer was suppressed at the time she filed her summary judgment motion, and, for that reason, she should have been barred from prosecuting that motion.

A trial court's discovery rulings will not be disturbed "absent an abuse of discretion or a mistaken understanding of the applicable law." Bayer v. Twp. of Union, 414 N.J. Super. 238, 272-73 (App. Div. 2010) (citing Payton v. N.J. Tpk. Auth., 148 N.J. 524, 559 (1997)). Although "[i]t is well-established that the main objective of the two-tier sanction process in Rule 4:23-5 is to compel discovery responses rather than to dismiss the case," A & M Farm & Garden Ctr. v. Am. Sprinkler Mech., LLC, 423 N.J. Super. 528, 534 (App. Div. 2012), a decision "to grant or deny a motion to reinstate a [pleading] lies within the sound discretion of the trial court," St. James AME Dev. Corp. v. City of Jersey City, 403 N.J. Super. 480, 484 (App. Div. 2008).

The court interpreted its August 3, 2018 order as having "granted [Maryanne's] motion to reinstate her answer" subject to her provision of

responses to interrogatories within thirty days. Plaintiff also understood the August 3, 2018 order resulted in the reinstatement of Maryanne's answer; plaintiff moved to suppress the answer due to Maryanne's failure to provide the outstanding discovery. Such a motion would have been unnecessary if, as plaintiff now contends, the August 3, 2018 order had already suppressed the answer.

In any event, it appears that both the court and counsel understood the answer was reinstated by the August 3, 2018 order. Based on that shared understanding, the court determined there was no need to decide the merits of plaintiff's motion to suppress the answer because Maryanne was otherwise entitled to judgment as a matter of law on plaintiff's claims. We find no error or abuse of discretion in the court's findings and determinations, and we affirm the order denying plaintiff's motion. On remand, however, plaintiff may move for appropriate relief based on any deficiencies in Maryanne's responses to outstanding discovery demands or any alleged lack of compliance with the court's prior orders.

Plaintiff also contends the court erred by denying its motion for an extension of the discovery period. We agree.

A-3197-18T1

Plaintiff sought an extension of the discovery period at least in part based on the restoration of Maryanne's and Nancy's pleadings, which had been suppressed. Rule 4:24-1(c) provides that "[o]n restoration of a pleading dismissed pursuant to . . . [Rule] 4:23-5(a)(1) or if good cause is otherwise shown, the court shall enter an order extending discovery." Thus, a court is required to enter an order extending discovery following the restoration of a pleading. Pressler & Verniero, Current N.J. Court Rules, cmt. 3 on R. 4:24-1 (2020) ("[Rule 4:24-1(c)] makes clear the discovery consequences when a pleading dismissed without prejudice under . . . [Rule] 4:23-5[(a)(1)] has been restored, namely, the court is obliged to fix a discovery period by order specifying the date on which described discovery is to be completed and such other terms as may be appropriate." (emphasis added)).

The court erred by failing to comply with the Rule's mandate following the restoration of Nancy's and Maryanne's respective pleadings. We therefore reverse the court's order denying plaintiff's request for an extension of discovery. On remand, the court shall address the status of discovery and, in its

discretion, order an appropriate extension of the discovery period based on the record presented.[10]

## IV.

Defendants appeal from the court's orders denying their requests for attorney's fees. It is unnecessary to address the merits of defendants' argument. The requests were founded on the premise that plaintiff's claims were barred as a matter of law by N.J.S.A. 30:13-3.1(a)(2), and, therefore, defendants were entitled to summary judgment. We have reversed the court's order granting defendants summary judgment, and, as result, the factual underpinning for defendants' requests for attorney's fees is no longer extant. We therefore vacate the orders denying defendants' attorney's fees requests. Defendants may renew their requests based on the outcome of the remand proceedings, and the court shall consider such requests based on the arguments and record presented at that time.

Antoinette also argues the court erred by granting plaintiff's motion for summary judgment on the claims asserted in her counterclaim. In its decision

---

[10] Our reversal of the court's order denying plaintiff's motion for an extension of discovery renders it unnecessary to address plaintiff's motion for reconsideration of the order.

A-3197-18T1

from the bench on plaintiff's motion, the court provided a long and detailed recitation of the parties' arguments but did not make any findings of fact or conclusions of law as required by Rule 1:7-4. Instead, the court simply stated, plaintiff's "motion [for summary judgment] is granted."

As we explained in Great Atlantic & Pacific Tea Co. v. Checchio, "[a] trial judge is obliged to set forth factual findings and correlate them to legal conclusions. Those findings and conclusions must then be measured against the standards set forth in Brill[, 142 N.J. at 540]." 335 N.J. Super. 495, 498 (App. Div. 2000). "Although our standard of review from the grant of a motion for summary judgment is de novo, our function as an appellate court is to review the decision of the trial court, not to decide the motion tabula rasa." Est. of Doerfler, 454 N.J. Super. at 301-02 (citation omitted). The court did not make any findings of fact or conclusions of law in accordance with Rule 1:7-4 supporting its grant of plaintiff's motion for summary judgment on Antoinette's counterclaim. We therefore vacate the court's order granting plaintiff summary judgment on the counterclaim and remand for further proceedings on the motion.

In summary, in A-3271-18, we reverse the court's orders granting defendants' motions for summary judgment and denying plaintiff's request for an extension of the discovery period. We affirm the order denying plaintiff's

39

motion to strike Maryanne's answer. In A-3197-18, we vacate the orders granting plaintiff summary judgment on Antoinette's counterclaim and denying Antoinette's request for attorney's fees award under N.J.S.A. 30:13-4.2 and -8, and we remand for further proceedings. In A-3526-18, we vacate the court's order denying Maryanne's and Nancy's requests for attorney's fees.[11] We remand the matters for further proceedings consistent with this opinion. We do not retain jurisdiction.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

---

[11] Nancy does not appeal from the court's order granting plaintiff's motion for summary judgment on her counterclaim, see Campagna ex rel. Greco v. Am. Cyanamid Co., 337 N.J. Super. 530, 550 (App. Div. 2001) (refusing to review on appeal an order not listed in the notice of appeal), and she does not argue the court erred by granting the motion, see Sklodowsky v. Lushis, 417 N.J. Super. 648, 657 (App. Div. 2011) (holding "[a]n issue not briefed on appeal is deemed waived"). We therefore do not address the order granting plaintiff summary judgment on Nancy's counterclaim, and on remand Nancy is precluded from prosecuting the counterclaim.

A-3197-18T1